[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14481
Non-Argument Calendar
_____

D.C. Docket No. 3:13-cv-00114-MCR-CJK

SANDSHAKER LOUNGE & PACKAGE
STORE LLC,
A Florida Limited Liability Company,

Plaintiff-Appellant,

versus

QUIETWATER ENTERTAINMENT INC.,
a Florida Corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(March 19, 2015)

Before ED CARNES, Chief Judge, HULL and ROSENBAUM, Circuit Judges.

PER CURIAM:

Sandshaker Lounge & Package Store appeals the district court's grant of summary judgment in favor of Quietwater Entertainment. The district court affirmed the Trademark Trial and Appeal Board's denial of Sandshaker's petition to cancel Quietwater's BUSHWACKER trademark.

I.

For decades until 2004 Linda Taylor owned the Sandshaker, a bar on Pensacola Beach. Sometime during the 1970s Taylor traveled to the U.S. Virgin Islands, where she was served a creamy, chocolaty alcoholic drink called a bushwacker.[1] When she returned to Florida, Taylor experimented and created her own drink, which has the consistency of a milkshake and contains rum, Kahlua, cream of coconut, crème de cacao, and milk. She began selling that concoction under the name "bushwacker" at the Sandshaker in 1977. The drink became hugely popular in the region and soon other nearby beach bars began serving their own versions. Taylor did not object to the other bars selling her drink because she felt the drink's popularity would be a rising tide lifting all local boats.

Across Pensacola Beach Boulevard from the Sandshaker is the Pensacola Beach boardwalk. Quietwater, owned by June Guerra, helped construct the

---

[1] Although the word presumably derives from "bushwhacker," it is spelled "bushwacker" for all purposes related to the drink. Because this opinion deals with three closely related and identically named concepts (the drink, the word, and the mark), we will use the following convention: bushwacker with no quotes for the drink, "bushwacker" in quotes for the word, and BUSHWACKER in all caps for the mark.

2

boardwalk in the 1980s and has owned or operated several establishments there, including Capt'n Fun's bar, the Jubilee restaurant, and Bushwacker's Backside.  In 1988 a group of local business owners, including Taylor and Guerra, met to brainstorm ideas to address the slowdown in beach trade that happened each August.  Guerra offered to hold a festival celebrating the bushwacker drink during the first weekend in August, featuring a "best bushwacker" contest and some bands.  Taylor again believed that any event that drew people to the area would benefit all of the local businesses, and she did not object to the use of the "bushwacker" name.

Both Sandshaker and Quietwater scheduled live music events on the first weekend in August 1988 to celebrate the bushwacker.  Quietwater's event was unquestionably larger and more elaborate, but the testimony and documentary evidence suggest that each party advertised its own bushwacker celebration that year and most years since.  Quietwater called its event variously the "Bushwacker Fest," "Bushwacker Festival," "Famous Bushwacker Festival," and "Famous Bushwacker and Music Festival."  Sandshaker called its event "Bushwacker Weekend" or "Bushwacker Beach Weekend."  Both companies held their events the same weekend each year.  Quietwater's event took place on the boardwalk and at its bar and restaurants, and Sandshaker's event took place across the street at the

3

Sandshaker.  Quietwater's festival reached its zenith in 1996 when Three Dog Night played.

In September 2004 Hurricane Ivan struck Pensacola as a Category 3 storm. Local businesses including Quietwater properties Jubilee and Bushwacker's Backside were hit hard, and both establishments closed their doors soon after. Worried its remaining facilities might not be repaired in time for the 2005 Bushwacker Festival and that mainland businesses might try to appropriate the event, Quietwater filed an application to register the BUSHWACKER mark in the category of "Entertainment services in the nature of a festival featuring live musical groups."  Quietwater did not disclose to the Patent and Trademark Office (PTO) that Sandshaker had simultaneously used the mark throughout the preceding seventeen years.  The PTO granted the application and published Quietwater's registration on February 8, 2005.

In May 2005 Sonny Campbell bought the Sandshaker.  He set about preparing for the 2005 "Bushwacker Beach Weekend," but in July Guerra called him and told him Sandshaker could not hold its event because Quietwater owned the BUSHWACKER trademark.

In October 2009 Sandshaker filed a petition for cancellation of Quietwater's BUSHWACKER mark as applied to the music festival.  The Trademark Trial and Appeal Board (TTAB) denied the petition after determining that Sandshaker had

4

no protectable interest in the BUSHWACKER mark as applied to the drink and that it was not a prior user of the mark as applied to the music festival. Sandshaker filed a civil action in the United States District Court for the Northern District of Florida seeking to overturn that decision.[2] Sandshaker sought cancellation of Quietwater's trademark under 15 U.S.C. §§ 1052, 1064, and 1125; damages and an injunction under § 1125; and a declaration of Sandshaker's common-law right to exclusive use of the BUSHWACKER mark in Sandshaker's zone of reputation. Each of these arguments was premised on the theory that Sandshaker owned protectable rights in the BUSHWACKER mark as applied to the drink. On cross motions for summary judgment, the district court ruled in favor of Quietwater. This is Sandshaker's appeal.

## II.

We review <u>de novo</u> a district court's grant of summary judgment. <u>McCullum v. Orlando Reg'l Healthcare Sys., Inc.</u>, 768 F.3d 1135, 1141 (11th Cir. 2014).

Sandshaker's arguments all stem from its contention that it owns protectable rights in the BUSHWACKER mark as applied to the drink and that those rights

---

[2] Under 15 U.S.C. § 1071, a party dissatisfied with the TTAB's decision may either appeal directly to the United States Court of Appeals for the Federal Circuit or file a civil action in a United States District Court.

5

trump any rights Quietwater has in the mark.[3]  But Sandshaker does not have any such rights.  Generic marks may not be registered.  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007).  That prohibition against federal registration reflects the principle that generic marks are in the public domain and may not be appropriated from it.  See id. ("Courts have generally held that a term used generically cannot be appropriated from the public domain; therefore, even if the name becomes in some degree associated with the source, a generic mark cannot achieve true secondary meaning.").  The TTAB found that BUSHWACKER "appears to be generic for a type of drink sold locally and at multiple locations throughout Pensacola Beach."

A court reviewing the TTAB's findings may not reverse those findings absent "testimony which in character and amount carries thorough conviction." Coach House Rest., Inc. v. Coach & Six Rests., Inc., 934 F.2d 1551, 1557 (11th Cir. 1991).  Far from thoroughly convincing us that the TTAB is wrong, the testimony introduced in the district court thoroughly convinces us that the TTAB is correct that "bushwacker" is a generic term for a chocolaty frozen drink containing rum and coffee liqueur.  Both parties agree that bars throughout the area and beyond make bushwackers.  Perhaps most tellingly, Sandshaker concedes that any

---

[3] We emphasize that our discussion here applies only to the BUSHWACKER mark.  We express no opinion about the HOME OF THE ORIGINAL BUSHWACKER mark that Sandshaker seeks to register.

new bar opening on Pensacola beach could sell a drink using the name "bushwacker" and that it was "a little too late [for Sandshaker] to have a problem with that." The drink served at the Sandshaker is merely a species of the genus "bushwacker," and thus BUSHWACKER is a generic mark for the drink. See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 187, 194, 105 S. Ct. 658, 661 (1985) ("A generic term is one that refers to the genus of which the particular product is a species."). Because it is generic as applied to the drink, it may not be registered as a trademark for that usage. See id. Nor may Sandshaker appropriate it from the public domain. See Forman, 509 F.3d at 1358. Sandshaker has no protectable right to BUSHWACKER as applied to the drink.

We turn now to Quietwater's contention that it has a protectable interest in the BUSHWACKER mark as applied to musical performances. When a mark has been on the Principal Register for less than five years at the time of the cancellation petition, "any ground that would have prevented registration in the first place qualifies as a valid ground for cancellation." Cunningham v. Laser Golf Corp., 222 F.3d 943, 946 (Fed. Cir. 2000); see also 15 U.S.C. § 1064(1); Coach House, 934 F.2d at 1557 (requiring "valid grounds for discontinuing registration").

Federal registration protects only trademark rights already acquired through adoption and use. See Turner v. HMH Publ'g Co., 380 F.2d 224, 228 (5th Cir. 1967) ("Under the Lanham Act, registration of a trademark confers only

procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration.") (citation omitted). [4] And trademark rights are appropriated under Florida law "only through actual prior use in commerce." Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1320 (11th Cir. 2011) (quotation marks omitted). Regardless of who came up with the idea of having a festival to celebrate the bushwacker drink, the district court found — and Quietwater concedes — that both parties began using the mark in commerce simultaneously in August 1988 to identify a festival event featuring live music. As between Sandshaker and Quietwater, there was no prior user. Thus Quietwater did not make "actual prior use in commerce" of the mark. See id.

Further, whatever rights Quietwater might have had, its slumber on them rivaled Rip van Winkle's.[5] Both parties used the mark in connection with live music events for nearly two decades, until Quietwater finally objected to Sandshaker's use in 2005.[6] When the district court rejected Sandshaker's

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[5] See Washington Irving, Rip Van Winkle and Other American Essays From the Sketch Book 27 (Houghton, Mifflin & Co. 1891) ("Rip's story was soon told, for the whole twenty years had been to him but as one night.").

[6] To the extent the district court's contrary conclusion on this point relies on a finding that Sandshaker was merely advertising its own participation in Quietwater's event, that finding is clearly erroneous. See Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010) ("[W]e review . . . the district court's findings of fact for clear error."); United States v.

8

trademark claim over the BUSHWACKER mark for the drink, it reasoned that Sandshaker's "knowing acquiescence to use of the name by other unrelated establishments" supported a finding that "Sandshaker did not have trade identity rights sufficient to create priority." True, but that reasoning applies with equal force to Quietwater's claim to its own mark. If Sandshaker's failure to enforce its rights killed its trademark, Quietwater's identical failure had the same lethal effect on its trademark. The evidence shows that throughout the entire relevant time period Sandshaker openly held and advertised its annual "Bushwacker Beach Weekend" featuring live musical performances. And it did so in plain view, across the street from Quietwater's properties.

It is a "bedrock principle of trademark law that a mark can identify and distinguish only a single commercial source." Jurado, 643 F.3d at 1320. Because both companies were using the mark, it never "identif[ied] and distinguish[ed] only a single commercial source" of musical celebrations of the bushwacker drink. See

---

Rodriguez-Lopez, 363 F.3d 1134, 1137 (11th Cir. 2004) ("For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed.") (quotation marks omitted). The record contains clear and ample evidence in the form of testimony and Sandshaker's advertisements for Sandshaker's events on Sandshaker's property that it always considered its musical event a celebration related to but separate from Quietwater's festival. A finding that Sandshaker's ads for its own events were actually advertising Quietwater's festival is akin to a finding that Quietwater's ads for $1.75 bushwackers sold at its restaurants were really advertising Sandshaker's drinks.

id. Quietwater thus never acquired any protectable right to the BUSHWACKER mark, and its registration is due to be canceled.

We **AFFIRM** the district court's judgment to the extent that it found that Sandshaker did not have protectable rights in the BUSHWACKER mark as applied to the drink. We **REVERSE** the remainder of the judgment and **REMAND** for further consideration in light of this opinion.